

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**02/16/2010**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 09-38044-H4-11** |
| | § | |
| **EXPRESS ENERGY SERVICES** | § | **Jointly Administered** |
| **OPERATING LP, et al.,** | § | |
| | § | |
| **Debtors.** | § | |
| | § | |
| | § | |

---

| | | |
|---|---|---|
| | § | |
| **DARRELL BREWER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adv. Proceeding No. 09-03445** |
| **v.** | § | |
| | § | |
| **EXPRESS ENERGY SERVICES** | § | |
| **OPERATING, LP, AND EXPRESS** | § | |
| **ENERGY SERVICES (2008) LLC,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION ON (1) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT; AND (2) DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGEMENT
[Adv. Docket Nos. 9 & 10]

### I. INTRODUCTION

These motions focus on the applicability of a noncompetition clause to Darrell Brewer, a former executive of the Debtor in this Chapter 11 case. For the reasons set forth below, the Defendants' Motion for Partial Summary Judgment is granted, and the Plaintiff's Motion for Partial Summary Judgment is denied.

## II. PROCEDURAL AND FACTUAL BACKGROUND

1.  Express Energy Services (Express) is an oilfield services company, providing services and equipment to the oil and gas exploration and production industry. [Adv. Docket No. 10, p. 2.]

2.  In 2000, Darrell Brewer (Brewer) helped found Express, and began serving as President and CEO. [Adv. Docket No. 9, p. 2; Adv. Docket No. 10, p. 2.]

3.  In June of 2008, Brewer, as a principal of Express, helped to negotiate the sale of Express to an investors' consortium, led by Macquarie Financial Holdings Limited (Macquarie). [Adv. Docket No. 9, p. 2.]

4.  B.L. Investments, L.L.C. (BLI) is a limited liability company owned by Brewer, his wife, and three children. BLI was one of the owners of Express prior to the sale to Macquarie. [Adv. Docket No. 10, Ex. D.]

5.  Express was sold for over $500 million, and BLI sold its equity shares in Express for approximately $70.9 million. BLI received $36.1 million in cash, and the remaining $34.8 million was rolled over as equity in the "new" Express. [Adv. Docket No. 10, p. 3.]

6.  Executed June 8, 2008, the Transaction Agreement (the Transaction Agreement) evidenced and set forth the terms of the sale. Brewer signed the Transaction Agreement three times in his capacity of President and CEO of Express and related affiliates, and once in his capacity as a member of BLI (i.e., as a member of one of the sellers of shares of Express). Brewer himself (i.e., in his individual capacity) did not sign the Transaction Agreement because he himself did not own shares of Express; only BLI, the entity which Brewer controlled, held such interests. Although Brewer himself did not sign the

Transaction Agreement, the Transaction Agreement nevertheless contained confidentiality and non-compete clauses limiting Brewer's ability to work were he to leave Express. [Adv. Docket No. 9, p. 4; Adv. Docket No. 9, Ex. 2]

7.    Section 7.14 of the Transaction Agreement (the T.A. Noncompete Clause),explicitly states that

> (b)    For a period from the Closing Date until the third anniversary of the Closing Date, (A) each Seller listed on <u>Schedule 7.14</u> shall not . . . directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of any business, whether in corporate, proprietorship or partnership form or otherwise, that is engaged, directly or indirectly in . . . any business engaged in by the [Express] Entities . . .and (B) each Seller shall not . . . directly or indirectly . . . (i) cause, solicit, induce or encourage any employees of [Express] to leave such employment or hire, employ or otherwise engage any such individual . . . or (ii) cause, induce or encourage any material actual or prospective client, customer, supplier, landlord, lessor or licensor of [Express] to terminate or modify any such actual or prospective relationship.

[Adv. Docket No. 9, Ex. 2.]

8.    Schedule 7.14 lists all eleven individuals bound by the T.A. Noncompete Clause. Five of these individuals are selling parties. Brewer is the first name on the Schedule. [Adv. Docket No. 10, p. 4; Adv. Docket No. 9, Ex. 2.]

9.    Section 11.4 of the Transaction Agreement states that New York law controls in the construction and enforcement of the Transaction Agreement. [Adv. Docket No. 10, p. 10; Adv. Docket No. 10, Ex. B.]

10.   On June 5, 2008, Brewer signed an Employment Agreement (the Employment Agreement) to remain with Express after the sale in order to ease the transition over to Macquarie. Macquarie wanted to keep Brewer as an Express employee in order to use his knowledge of the industry and personal contacts. He was to remain President and CEO of

Express, earning $12,500 per month. Additionally, he also agreed to remain on the Board of Directors. [Adv. Docket No. 10, p.5; Adv. Docket No. 10, Ex. E.]

11.   On November 17, 2008, approximately five months after the sale of Express and the signing of the Employment Agreement, Brewer's employment with Express ended. He signed a Separation and Consulting Agreement and Release (the Separation Agreement) that allowed him to leave and maintain a consultant's position with Express, earning $12,500 per month. [Adv. Docket No. 10, pp. 5–6; Adv. Docket No. 9, p. 4.; Adv. Docket No. 9, Ex. 4.]

12.   The Separation Agreement contains confidentiality and non-compete clauses substantially similar to the Transaction Agreement. [Adv. Docket No. 10, p.6; Adv. Docket No. 9, pp. 4–5.]

13.   In part, Section 3(c) of the "Nondisclosure and Noncompetition" portion of the Separation Agreement (the S.A. Noncompete Clause) states that:

> (i) You shall not, directly or indirectly, for yourself or others, own, manage, operate, loan money to, control or participate in the ownership, management, operation or control of any business, whether in corporate, proprietorship or partnership form or otherwise, that is engaged, directly or indirectly, in the Restricted Territory in any Restricted Business . . . .
> (ii) You shall not, directly or indirectly . . . (A) cause, solicit, induce or encourage any individual who, on the Separation Date [November 17, 2008], is an employee of [Express] to leave such employment or hire, employ or otherwise engage any such individual . . . or (B) cause, induce or encourage any material actual or prospective client, customer, supplier, landlord, lessor or licensor of [Express] to terminate or modify any such actual or prospective relationship that exists on the Separation Date. . . . Additionally, you shall not hire, employ or otherwise engage the services of Annie Gaudet for a period six months following the date of her termination of employment with [Express] . . . . For the avoidance of doubt, the term of the restrictive covenants contained in this Section 3(c) shall continue in effect during the period of time beginning on the Separation Date and ending on the earlier of (A) June 30, 2011 or (B) the

4

> date that [Express] becomes a majority-owned subsidiary of or is
> controlled . . . by an entity other than [the Macquarie consortium].

[Adv. Docket No. 9, Ex. 4.] (emphasis added)

14.   Section 3(a) of the "Nondisclosure and Noncompetition" is the definition section, and

defines certain key terms, including "Restricted Business," and "Restricted Territory."

[Adv. Docket No. 9, Ex. 4.]

15.   Restricted Business is defined as

> (A) within the Restricted Territory, (y) any business line that [Express]
> offers and (z) any oilfield service business involving the purchase of
> automated casing running tools which competes against [Express] with
> such tools, . . . as of the Separation Date . . . , regardless of whether
> [Express] is operating any particular Express Business Line or offering
> such service in the Restricted Territory; (B) within the Rocky Mountain
> Region, any business line providing casing, laydown, motors or pressure
> testing services; (C) outside the Restricted Territory, any Express Business
> Line, unless you offer [Express] (y) the opportunity to enter into a
> partnership or other financial arrangement with you as to which [Express]
> has no less than 40% economic interest in such business and (z) the right
> of first offer with respect to your interest upon the sale of such business at
> all times; (D) any oil field service business other than an Express Business
> Line, unless you offer the Company the right of first offer upon the sale of
> such business at all times.

[Adv. Docket No. 9, Ex. 4.]

16.   Restricted Territory is defined as

> (iii) "Restricted Territory" means the Gulf of Mexico, Arkansas, North
> Dakota, Oklahoma, Pennsylvania, Texas, New Mexico (but excluding
> counties in New Mexico comprising a portion of the Rocky Mountain
> Region) and in Louisiana, Caddo, Bossier, Desoto, Red River, Webster,
> Claiborne and Bienville Parishes.
> (iv) "Rocky Mountain Region" shall mean Colorado, Utah, Wyoming and
> in New Mexico, Lea, Eddy, Roosevelt, Chaves, Otero, Dona Ana, Lincoln,
> De Baca and Quay counties.

[Adv. Docket No. 9, Ex. 4.]

17.   Section 3(e) of the Separation Agreement contains a clause stating that all disputes regarding confidentiality and noncompetition are to be decided exclusively under Texas law. [Adv. Docket No. 10, Ex. F.]

18.   Section 14 of the Separation Agreement, titled "Entire Agreement," (the Noninterference Clause) states a follows:

> This Agreement contains the entire agreement of the parties relating to the subject matter thereof, and supersedes and replaces the Employment Agreement and all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of any party hereto with respect thereto in their entirety. Notwithstanding the above, this Agreement shall not interfere with, supersede or replace in any way the promises, covenants, arrangements, communications, representations or warranties contained in the Transaction Agreement, LLC Agreement or any other agreement of any of the parties hereto (except for the Employment Agreement).

[Adv. Docket No. 10, Ex. F.] (emphasis added)

19.   In January 2009, Brewer provided his last service as an Express consultant pursuant to the Separation Agreement. [Adv. Docket No. 9, p. 6.]

20.   On October 27, 2009, Express filed its Chapter 11 petition. [Main Case Docket No. 1.]

21.   On December 7, 2009, this Court confirmed Express' plan of reorganization (the Plan). [Main Case Docket No. 189.] Under the terms of the Plan, all of the equity shares owned by Macquarie were cancelled, and shares of the reorganized Express were issued to certain creditors. [Main Case Docket No. 189.] Thus, as a result of the confirmation of the Plan, Express became owned by an entity other than Macquarie.

22.   On December 31, 2009, Brewer filed a Motion for Partial Summary Judgment, seeking the nullification of the T.A. Noncompete Clause. [Adv. Docket No. 9.]

23.    Also on December 31, 2009, Express filed its own Motion for Partial Summary Judgment, seeking the enforcement of the T.A. Noncompete Clause. [Adv. Docket No. 10.]

24.    On January 15, 2010, Brewer filed his Response to Defendant's Motion for Partial Summary Judgment. [Adv. Docket. No. 11.]

25.    On January 15, 2010, Express filed an Opposition to Plaintiff's Motion for Partial Summary Judgment, seeking the denial of Brewer's Motion of Partial Summary Judgment. [Adv. Docket No. 12]

26.    On January 19, 2010, this Court held a hearing on the competing Motions for Summary Judgment and Responses thereto. After hearing oral arguments of counsel, this Court took the matter under advisement.

### III. CONCLUSIONS OF LAW

**A.    Jurisdiction and Venue**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).   This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (C), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)* Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular

circumstance"). Indeed, all of the parties have stipulated that this dispute is a core proceeding. [Adv. Docket No. 1, p. 7; Adv. Docket No. 2, p. 2.] Venue is proper pursuant to 28 U.S.C. § 1409.

**B.      The T.A. Noncompete Clause Applies to Brewer**

1.      The Noninterference Clause binds Brewer to the T.A. Noncompete Clause

Brewer contends that he is no longer bound by the S.A. Noncompete Clause because the confirmation of the Plan resulted in a change of ownership of Express, and the S.A. Noncompete Clause expressly relieves him of the covenants upon such a change. [Finding of Fact No. 13.]

On the other hand, Express contends that Brewer is still bound by the T.A. Noncompete Clause because the Noninterference Clause—which is in the Separation Agreement—expressly states that: "Notwithstanding the above, this Agreement shall not interfere with, supersede or replace in any way the promises, covenants, arrangements, communications, representations or warranties contained in the Transaction Agreement, LLC Agreement or any other agreement of any of the parties hereto (except for the Employment Agreement)." [Finding of Fact No. 18.]

This Court agrees with Express. The Noninterference Clause is not boilerplate language which happened to be thrown into the Separation Agreement as an afterthought. Just the contrary: the Noninterference Clause expressly sets forth that the Separation Agreement does **not** supersede and replace any of the covenants contained in the Transaction Agreement, except those in the Employment Agreement. There is absolutely no ambiguity in this respect. Accordingly, this Court concludes that if there is a conflict between the T.A. Noncompete Clause and the S.A. Noncompete Clause, then the T.A. Noncompete Clause governs.

And, indeed, there is a conflict. The S.A. Noncompete Clause states that if Express changes ownership, then the restrictive covenants immediately terminate; [Finding of Fact No. 13]; whereas, the T.A. Noncompete Clause simply states that the restrictive covenants shall remain in effect until the third anniversary of the Closing Date—which is in June or July of 2011.[1] [Finding of Fact No. 7.] Given this conflict in the language, and given the unambiguous language in the Noninterference Clause, this Court concludes that the T.A. Noncompete Clause controls over the S.A. Noncompete Clause, and that, even though there has been a change in ownership as a result of the confirmation of the Plan, Brewer is nevertheless still bound by the T.A. Noncompete Clause.

Brewer argues that because the Separation Agreement was negotiated and signed several months after the Transaction Agreement, and because Brewer departed Express as a result of the Separation Agreement, the terms of the S.A. Noncompete Clause should govern and that he should be allowed to compete immediately in the wake of the change in ownership of Express. Indeed, Brewer argues that it is illogical to keep the T.A. Noncompete Clause in effect because the S.A. Noncompete Clause is a very specific clause and the Noninterference Clause in the Separation Agreement is a more general clause. This Court disagrees. The Noninterference Clause is very specific, at least equally as specific as the S.A. Noncompete Clause. The Noninterference Clause unequivocally states that the Separation Agreement "shall not interfere with, supersede or replace in any way the promises, covenants, arrangements, communications, representations or warranties contained in the Transaction Agreement, LLC Agreement or any other agreement of any of the parties hereto (except for the Employment Agreement)." [Finding of Fact No. 18.]

---

[1] The record is not clear as to the exact Closing Date.

Contrary to what Brewer states about Express— namely, that Express "now wants to retrade the deal it made and . . . to ignore the Separation Agreement . . ." [Adv. Docket No. 9, p. 7]—this Court concludes that it is Brewer who wants to retrade the deal. He wants this Court to disregard the specific and express language in the Noninterference Clause in order to relieve him of his obligations under the T.A. Noncompete Clause so that he may immediately compete against Express. This, the Court will not do. Indeed, it is clear to this Court that all parties to these agreements are sophisticated business persons who had high-powered counsel representing them. The language in the Noninterference Clause is not a scrivener's error, but rather specific language that the parties negotiated and that counsel for the parties drafted and had the opportunity to review and change prior to their clients executing the Separation Agreement. *See Burger King v. Rudzewicz*, 471 U.S. 462, 483–84 (1985) (enforcing choice of law provision against "sophisticated businessman" and affirming District Court's finding of no economic duress or disadvantage); *Newton v. Rumery*, 480 U.S. 386, 394–95 (1987) (upholding unrelated criminal release-dismissal agreement voluntarily signed when sophisticated businessman not in jail, had benefit of counsel and had previously filed suit against the same municipality).

2.   Brewer obligated himself individually when he signed the Transaction Agreement on behalf of Express

Brewer's second argument as to why he ought to be immediately allowed to compete against Express is that he is not bound by the T.A. Noncompete Clause because he, in his individual capacity, is not a party to the Transaction Agreement. Thus, he contends that the only noncompete provision to which he is bound is the S.A. Noncompete Clause; and because that clause relieves him of his noncompete obligations if Express is sold, he is now free to

immediately compete because Express has changed ownership in the wake of the confirmation of the Plan. [Finding of Fact Nos. 13 & 21.]

The Court finds this argument to be disingenuous. Brewer is correct that there is no signature line on the Transaction Agreement that reads "Darrell Brewer" or "Darrell Brewer, individually" or "Darrell Brewer, in his individual capacity." However, Brewer signed the Transaction Agreement four times, three of which were on behalf of Express and affiliated entities and one of which was on behalf of BLI, the company that he, his wife, and three children own. [Finding of Fact No. 4.] When he signed the Transaction Agreement in these various capacities, he knew that the Transaction Agreement contained the T.A. Noncompete Clause and he also knew that this particular clause applied to him. Indeed, Schedule 7.14 of the Transaction Agreement expressly lists Brewer as one of the eleven individuals bound by the T.A. Noncompete Clause. [Finding of Fact No. 8] Furthermore, this Court has no doubt that had Brewer refused to agree to be subject to the T.A. Noncompete Clause, the sale evidenced by the Transaction Agreement would not have been consummated. There is no way that the Macquarie-led group would have paid over $500 million if Brewer could have immediately competed against Express. [Finding of Fact No. 5.] Moreover, Brewer conveniently overlooks the fact that as a result of Macquarie purchasing Express, his family-owned company, BLI, which sold its shares to Macquarie, received approximately $70 million. [Finding of Fact No. 5.] If Brewer had been unwilling to be subject to the T.A. Noncompete Clause, BLI would not have received this extraordinary consideration. Now, in an effort to escape the bargain from which he and his family-owned company benefited handsomely, Brewer has concocted the flimsy rationale that

11

because he did not sign the Transaction Agreement in his individual capacity, he is not bound by any of the terms of this document.

Case law says otherwise. Indeed, Brewer is individually bound by his signing of the Transaction Agreement in his individual capacity. *See, e.g., Instone Travel Tech. Marine & Offshore v. Int'l Shipping Partners*, 334 F.3d 423, 430–31 (5th Cir. 2003) (applying Texas law, third party agent purchaser held personally liable for tickets purchased for plaintiff); *Whitney Nat'l Bank v. Air Ambulance by B&C Flight Mgmt., Inc.*, No. H-04-2220, 2006 U.S. Dist. LEXIS 90706, at *15–17 (S.D. Tex. Dec. 15, 2006) (company president who signed loan agreement four times as corporate officer signed in individual capacity); *Dann v. Team Bank*, 788 S.W.2d 182, 184–85 (Tex. App.—Dallas 1990, no writ) (bank president who signed loan guaranty held as personal guarantor); *Am. Petrofina v. Bryan*, 519 S.W.2d 484, 487 (Tex. App.— El Paso 1975, no writ) (defendant brothers held liable individually on contract signed in corporate capacity); *Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 256 (Tex. App.— Houston [14th Dist.] 2003, no pet.) (individual held party to contract signed as corporate officer).

Aside from this case law, there is no question that Brewer did sign the Separation Agreement in his individual capacity. [Finding of Fact No. 11.] And, there is no question that the Separation Agreement contains the Noninterference Clause. Hence, even if Brewer is correct that the absence of his personal signature on the Transaction Agreement did not bind him to that agreement at the time of the execution in June of 2008, Brewer's signing the Separation Agreement in November of 2008 nevertheless binds him to the T.A. Noncompete Clause because the Noninterference Clause expressly states that the Separation Agreement "shall not interfere with, supersede or replace in any way the promises, covenants, arrangements,

communications, representations or warranties contained in the Transaction Agreement, LLC Agreement or any other agreement of any of the parties hereto (except for the Employment Agreement)." [Finding of Fact No. 18.]

3.    New York Law Governs the Transaction Agreement

The Transaction Agreement contains a "choice of law" clause, stating that New York law governs. [Finding of Fact No.9.] A "choice of law" clause is a "contractual provision by which the parties designate the jurisdiction whose law will govern any disputes that may arise between the parties." BLACK'S LAW DICTIONARY 258 (8th ed. 2004). "The Supreme Court of Texas has recognized that contractual choice of law provisions should generally be enforced." *Int'l Interests, L.P. v. Hardy,* 448 F.3d 303, 306 (5th Cir. 2006). "The ultimate goal in contract interpretation is realization and effectuation of the parties' intent. Such intent is to be gleaned not only from the literal language of the agreement, but also from whatever may be implied therefrom." *In re Estate of Shatraw,* 887 N.Y.S.2d 722, 723 (App. Div. 2009) (citations omitted). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent, and the best evidence of what parties to a written agreement intend is what they say in writing." *MHR Capital Partners LP v. Presstek, Inc.,* 12 N.Y.3d 640, 646 (App. Div. 2009).

Here, the Court concludes that the parties' intent, at the time the Transaction Agreement was executed, was for the Transaction Agreement—including the T.A. Noncompete clause—to apply to Brewer. Indeed, the T.A. Noncompete Clause expressly applies to each "Seller listed on Schedule 7.14," and Brewer is the first person listed.[2] [Finding of Fact Nos. 7, 8.]   The T.A.

---

[2]   It is worth noting that Schedule 7.14 contains the names of eleven individuals, the first of whom is Brewer.  It is also worth noting that the phrase used in the T.A. Noncompete Clause is "each Seller listed on Schedule 7.14."  The word "Seller" is a defined term under the Transaction Agreement and refers to the following "the EES Class A

Noncompete Clause limits those individuals listed on Schedule 7.14 from "directly or indirectly, own[ing], manag[ing], operat[ing], control[ling] or participating in the ownership, management, operation or control of any business, whether in corporate, proprietorship or partnership form . . . engaged . . . in any business engaged in by [Express]." [Finding of Fact No. 7.] Moreover, the T.A. Noncompete Clause prohibits the recruitment of any Express employees or clients. [Finding of Fact No. 7.] Finally, the noncompetition period lasts until the third anniversary of the Closing Date.[3] [Finding of Fact No. 7.] Brewer's presence on Schedule 7.14 means that he may not compete with Express in any similar business until June of 2011, at the earliest, unless his interpretation of the Separation Agreement controls. Likewise, he may not recruit employees or clients whom he met while working at Express until June 2011.  Unless Brewer and Express agreed to a modification of the T.A. Noncompete Clause, Brewer is bound by the T.A. Noncompete Clause.

**C.     The Separation Agreement Operates Concurrently with the T.A. Noncompete Clause**

Brewer argues that the Separation Agreement constitutes a separate, controlling agreement, and that this contract superseded the Transaction Agreement.  The Separation Agreement specifies that Texas contract law controls in the resolution of any dispute regarding the S.A. Noncompete Clause. [Finding of Fact No. 17.] Texas contract law applies because the dispute arose in Texas, it involves a company with substantial operations in the state, numerous subsidiaries are registered Texas LPs, and the general partner in Express is Express Energy

---

Holders, McCoy, Preston, the EES P&A Sellers and the EES WL Sellers." Thus,  the T.A. Noncompete Clause reference to "each Seller" refers not to the "Sellers" defined in the definitional section of the Transaction Agreement, but rather to what is referred to in the Table of Contents of the Transaction Agreement (page v) as the "Non-Competition Sellers."

[3] It is unclear to this Court when the Closing Date of the Transaction Agreement actually is, but the Court would still place the Closing Date in June or July of 2008.

14

Services GP, LLC, a Texas limited liability company. *Neo Sack, Ltd. v. Vinmar Impex, Inc.,* 810 F. Supp. 829, 838 (S.D. Tex. 1993) ("[T]he rights and duties of the parties are determined by the local law of the state or country that has the most significant relationship to the transaction and the parties.").

Texas contract law "examine[s a contract] as a whole to ascertain the true intent of the parties." *Utica Nat'l Ins. Co. v. Am. Indem. Co.,* 141 S.W.3d 198, 202 (Tex. 2004) (citing *Mid-Century Ins. Co. v. Lindsey,* 997 S.W.2d 153, 158 (Tex. 1999)). "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1995). "A court is bound to read all parts of a contract together to ascertain the agreement of the parties. The  contract must be considered as a whole. Moreover, each part of the contract should be given effect." 4 EDITH SCHAFFER, TEXAS JURISPRUDENCE PLEADING & PRACTICE FORMS § 72:2 (2d ed. 2002). If the written contract can be given a "definite or certain legal meaning, then it is not ambiguous." *CBI Indus.,* 907 S.W.2d at 520 (citations omitted).

The Separation Agreement plainly states "that the Employment Agreement is terminated and no longer in effect." Separation Agreement § 1(a). The Separation Agreement's Article 3, "Nondisclosure and Noncompetition," defines what limits by which Brewer must abide by after leaving Express. The section specifically refers to the T.A. Noncompete Clause language to emphasize that Brewer is still bound, with the added prohibition against lending money to a potential competitor. [Finding of Fact No. 13.] Furthermore, he is still subject to the same non-solicitation of client and employee language in the Transaction Agreement, with the further explicit prohibition against the hiring of a specific employee. [Finding of Fact No. 13.]

Most critically, the Noninterference Clause states that the Separation Agreement "shall not interfere with, supersede, or replace in any way the promises, covenants, arrangements, communication, representations or warranties contained in the Transaction Agreement, LLC Agreement or any other agreement of any of the parties hereto (except for the Employment Agreement)." [Finding of Fact No. 18.] Plainly, the Separation Agreement does not control all aspects of the non-compete obligations of Brewer; even though the Employment Agreement is terminated, the T.A. Noncompete Clause remains in effect. [Finding of Fact No. 18.] The Separation Agreement is thus operating concurrently with—and does not replace—the T.A. Noncompete Clause.  Brewer is therefore still subject to the T.A. Noncompete Clause.

## IV. CONCLUSION

For the reasons set forth above, the Express's Motion for Partial Summary Judgment is granted, and the Brewer's Motion for Partial Summary Judgment is denied.

An order consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 16th day of February, 2010.

Jeff Bohm
United States Bankruptcy Judge